UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SETH WHEELER,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>        Defendant. | CASE NO. 1:23-CV-00106-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION AND ORDER** |

INTRODUCTION

Plaintiff Sean Wheeler challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 4, 2023, the parties consented to my exercising jurisdiction over this case pursuant to 28 U.S.C. § 636(c). (ECF #7). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Mr. Wheeler filed for DIB and SSI on January 28, 2021, alleging a disability onset date of May 14, 2020. (Tr. 232). The claims were denied initially and on reconsideration. (Tr. 91-124). Mr. Wheeler then requested a hearing before an Administrative Law Judge. (Tr. 152-53). Mr. Wheeler (represented by counsel) and a vocational expert (VE) testified before the ALJ on January 25, 2022. (Tr. 36-59). On February 9, 2022, the ALJ determined Mr. Wheeler was not disabled. (Tr. 16-35).

1

The Appeals Council denied Mr. Wheeler's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Wheeler timely filed this action on January 19, 2023. (ECF #1).

## FACTUAL BACKGROUND

### I. PERSONAL AND VOCATIONAL EVIDENCE

Mr. Wheeler was 25 years old on the alleged onset date, which the regulations define as a "younger individual." (Tr. 30; 28 C.F.R. § 404.1563(c)). Mr. Wheeler completed high school but has no past relevant work. (*Id.*).

### II. RELEVANT MEDICAL EVIDENCE

Mr. Wheeler treated with psychiatric nurse practitioner Dawn Dunaway for medication management of his bipolar disorder and anxiety. (*See., e.g.*, Tr. 1602-05). During his appointment on July 2, 2020, Mr. Wheeler reported he had stopped taking Neurontin and Elavil because he felt they were not helpful. (Tr. 1602). He reported feeling anxious and apathetic, and described his mood as irritable and lacking motivation. (*Id.*). He had been doing well before COVID, including working part-time although he found work too stressful, took time off, and never returned. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres, and his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was relaxed, speech was normal, and thought form was logical. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway discontinued Elavil and Neurontin and started Mr. Wheeler on Depakote. (Tr. 1603). She recommended he follow up in two weeks. (Tr. 1604).

On August 8, 2020, Mr. Wheeler attended a follow up session with NP Dunaway. (Tr. 1606). He reported being dizzy and "zoned out" on Trileptal and stopped taking it after a week; he

was compliant with his 500 mg dose of Depakote. (*Id.*). His mood was anxious and irritable and wished to switch mood stabilizers. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres; his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was constricted, speech was normal, and thought form was logical. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway discontinued Trileptal and Depakote and started Mr. Wheeler on Equetro 100 mg for two weeks and 200 mg thereafter. (Tr. 1607). He was assessed as having an unspecified anxiety disorder and bipolar disorder in full remission with most recent episode depressed. (Tr. 1608). She recommended he follow up in three weeks. (*Id.*).

At follow up on August 27, 2020, Mr. Wheeler reported that he felt "hung over" the next day on his new medication and would sometimes forget to take the second dose at the end of the day. (Tr. 1610). He did not notice a difference in mood and continued feeling angry. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres, his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was constricted, speech was normal, and thought form was logical. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway started Mr. Wheeler on Lamictal and discontinued Equetro. (Tr. 1612). She recommended he follow up in four weeks. (*Id.*).

On October 17, 2020, Mr. Wheeler reported he had stopped taking Lamictal; he was still feeling angry and was more tired. (Tr. 1614). He reported anxiety and a mild panic attack. (*Id.*). He wished to go back on Depakote. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres, his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was constricted, speech was normal, and thought form was logical. (*Id.*). He denied hallucinations,

3

suicidal or homicidal ideations. (*Id.*). NP Dunaway discontinued Lamictal and started Mr. Wheeler on Klonopin 0.5 mg and Depakote 500 mg. (Tr. 1616). She recommended he follow up in four weeks. (*Id.*).

On November 14, 2020, Mr. Wheeler reported he took Klonopin at bedtime that helped his anxiety; he slept 7 to 12 hours at night but sometimes had nightmares. (Tr. 1618). He noticed no difference with Depakote and weaned himself off of it completely. (*Id.*). He still had anger episodes. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres, his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was constricted, speech was normal, and thought form was logical. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway added Latuda 20 mg, continued Klonopin, and discontinued Depakote. (Tr. 1620-21). She recommended he follow up in two weeks. (Tr. 1620).

At follow up on November 28, 2020, Mr. Wheeler reported that Latuda helped his anger but he still felt depressed. (Tr. 1622). He reported being unsure if the Klonopin was helping his depression, so he stopped taking it for a period; he determined he feels better with a half-pill of Klonopin but did not want to take it anymore. (*Id.*). He felt more motivated and considered applying for jobs but was still pursuing disability benefits. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres, his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was constricted, speech was normal, and thought form was logical. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway noted improved interval progress and recommended he follow up in two weeks. (Tr. 1623-24). She added Xanax as needed, continued Latuda, and discontinued Klonopin. (Tr. 1624).

On December 17, 2020, Mr. Wheeler reported that he felt "pretty good" and denied anger and irritability. (Tr. 1626). He was compliant with Latuda and took Xanax twice, reporting that Xanax tired him, relieved his anxiety, and did not cause mood changes like Klonopin. (*Id.*). On examination, he was oriented in three spheres, his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was unable to be assessed, his speech was normal, and thought form was logical. (*Id.*). His mood was neutral. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway noted improved interval progress and continued his medications. (Tr. 1627).

On March 11, 2021, Mr. Wheeler reported to NP Dunaway that his therapist wants him to try hypnotherapy to address his anger and rage issues present during his manic period. (Tr. 1629). He reported a frustrated mood and boredom; he stated he did not feel normal. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres; his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was restricted, speech was normal, and thought form was logical. (*Id.*). Mood was bored but no longer down, and he denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway noted improved interval progress, made no medication changes, and recommended follow up in six months. (Tr. 1630-31).

On May 29, 2021, Mr. Wheeler reported scheduling a visit earlier than recommended because he had been feeling kind of down. (Tr. 1633; *see also* Tr. 1574). He was feeling unmotivated and had stopped his hobbies. (*Id.*). He had difficulty falling asleep, but when he finally fell asleep, he would sleep for 10 to 12 hours. (*Id.*). He reported being anxious when he went out in public and would use Xanax only when feeling anxious around bedtime because it made him too tired if he was leaving the house. (*Id.*). He denied panic attacks. (*Id.*). On

5

examination, Mr. Wheeler was oriented in three spheres, his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was restricted, mood was down, speech was normal, and thought form was logical. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway increased Latuda from 40 mg to 60 mg daily. (Tr. 1636; *see also* Tr. 1577). She noted improved interval progress and recommended follow up in six months. (Tr. 1634-35; *see also* Tr. 1575-76).

On June 28, 2021, Mr. Wheeler reported he noticed no difference from the increased Latuda; he was more often having difficulty falling asleep but would sleep 12 hours a night. (Tr. 1637; *see also* Tr. 1578). He was unmotivated and stopped his hobbies but was otherwise not in a bad mood. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres, his memory, attention and concentration, and judgment and insight were fair. (*Id.*). His affect was restricted, speech was normal, and thought form was logical. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway noted his sleep was disrupted at the interval progress and continued his medications. (Tr. 1638; *see also* Tr. 1579).

On August 7, 2021, Mr. Wheeler reported poor sleep and a disrupted sleep schedule in which he was up late at night and sleeping during the day. (Tr. 1643). Xanax was not working to help his sleep, so he stopped taking it. (*Id.*). He rated his anxiety at 3/10. (*Id.*). On examination, Mr. Wheeler was oriented in three spheres, his memory, attention and concentration, and judgment and insight were fair. (Tr. 1643-44). His affect was restricted but he smiled appropriately, his speech was normal, and thought form was logical. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). His mood was described as "bored but not depressed ok." (*Id.*). NP Dunaway noted his sleep was disrupted at the interval progress. (Tr. 1644). She decreased the

6

dosage of Latuda, discontinued Xanax, and started Mr. Wheeler on Elavil as needed for sleep. (*Id.*). She recommended he return in five weeks. (Tr. 1645).

Mr. Wheeler returned for a visit with NP Dunaway on September 9, 2021. (Tr. 1647-57). He reported an improved mood, more regular sleep so he was not as tired during the day, more interest in his hobbies, and losing 15 pounds. (Tr. 1659). On examination, Mr. Wheeler was oriented in three spheres, and his memory, attention and concentration, and judgment and insight were fair. (Tr. 1663). His affect was congruent with mood, speech was clear, and thought process was linear. (*Id.*). He denied hallucinations, suicidal or homicidal ideations. (*Id.*). NP Dunaway increased melatonin to 9-12 mg, continued Rexulti 0.5 mg daily, and recommended considering Rozerem. (Tr. 1664).

At a visit on November 4, 2021, Mr. Wheeler reported his sleep was not regular and frequently included nightmares. (Tr. 1670). He reported having anxiety some but not all days, and sometimes it spikes to 6-7/10. (Tr. 1670). He had started seeing a new therapist. (Tr. 1671). On examination, he was oriented in three spheres, and his memory, attention and concentration, and judgment and insight were fair. (Tr. 1674). His affect was congruent with mood, speech was clear, and thought process was linear. (*Id.*). He denied hallucinations, paranoia, and suicidal or homicidal ideations. (*Id.*). NP Dunaway held melatonin, began ramelteon 8 mg, and continued Rexulti. (Tr. 1675).

On November 18, 2021, Mr. Wheeler reported continued issues with sleep but melatonin seemed to work most of the time. (Tr. 1681). He was compliant with his medications and had started individual therapy, meeting every two weeks. (*Id.*). He reported increased irritability. (*Id.*). On examination, he was oriented in all spheres, had euthymic mood and appropriate affect. (Tr.

7

1687). Judgment was good and anxiety moderate. (*Id.*). The examination was generally within normal limits. (*Id.*). The diagnostic impression at this visit was bipolar disorder stable in remission. (Tr. 1688). NP Dunaway continued Mr. Wheeler's current medication regimen. (*Id.*).

On December 14, 2021, Mr. Wheeler reported nightmares with increased intensity and a headache the entire next day on ramelteon. (Tr. 1691). He described his mood as tired and frustrated with his disrupted sleep. (*Id.*). On examination, he was oriented in all spheres, had euthymic mood and appropriate affect. (Tr. 1693). Judgment was good, and anxiety moderate. (*Id.*). The examination was generally within normal limits. (*Id.*). NP Dunaway continued Rexulti, restarted Trazodone as needed for sleep, and began a Prazosin titration for sleep and nightmares. (Tr. 1695).

On January 20, 2022, Mr. Wheeler described his mood as okay but possibly more irritable. (Tr. 1696). He reported improved sleep on Prazosin. (*Id.*). On examination, he was oriented in all spheres, had slightly irritable mood and appropriate affect. (Tr. 1697-98). Judgment was good, and anxiety mild. (*Id.*). His attention and concentration were characterized by distractibility. (Tr. 1698). He denied suicidal and homicidal ideations. (*Id.*). NP Dunaway continued Rexulti and increased both Trazodone and Prazosin. (Tr. 1699). She recommended Mr. Wheeler complete a sleep study but he had not done so yet. (*Id.*).

III.     MEDICAL OPINIONS

**State Agency Reviewers.** On April 22, 2021, State agency psychological reviewer Robin Murry-Hoffman, Psy.D., noted Mr. Wheeler's medical history indicated he had a period of time where his symptoms were not well managed, but his new medication regimen appeared to be working better. (Tr. 95, 104). She opined he could carry out very short and simple instructions

8

without limitation and experienced no significant limitation in his ability to carry out detailed instructions. (*Id.*). She found moderate limitation in his abilities to maintain attention and concentration for extended periods and to perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances. (*Id.*). He had no evidence of limitation in his ability to work in coordination with or in proximity to others without being distracted by them, and no limitation in his ability to make simple work-related decisions (Tr. 96, 105). He had moderate limitation in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest breaks. (*Id.*). He had moderate limitation in his ability to respond to changes in the work setting and no significant limitation in his ability to set realistic goals or make plans independently of others. (*Id.*). Mr. Wheeler was capable of adjusting to minor and infrequent changes in his routine tasks. (*Id.*).

On July 27, 2021, Leslie Rudy, Ph.D., reviewed Mr. Wheeler's file and affirmed Dr. Murry-Hoffman's findings. (Tr. 110-16, 120-24).

**Treating Provider.** On January 24, 2022, NP Dunaway completed a medical RFC questionnaire. (Tr. 1701-06). She indicated she treated his bipolar disorder and generalized anxiety disorder with panic attacks in 30-minute appointments every three to six weeks for medication management. (Tr. 1701). Nurse Dunaway opined that Mr. Wheeler does not have long periods of stability or remission in between hospital inpatient admissions. (Tr. 1701). On a checkbox form, she indicated he is unable to meet competitive standards in the following areas: maintaining attention for two-hour segments, maintaining regular attendance and being punctual with customary tolerances and completing a normal workday and work week without interruptions

9

from psychologically based symptoms. (Tr. 1702). She opined Mr. Wheeler is seriously limited, but not precluded in the following areas: accepting instructions, responding appropriately to criticism from supervisors, getting along with coworkers and peers without distracting them or exhibiting extremes, and dealing with normal work stress, dealing with stress of semi-skilled or skilled work, adhering to basic standards of neatness and cleanliness, traveling in an unfamiliar place, and using public transportation. (Tr. 1702-03). She opined he was limited but satisfactory in all other areas. (*Id.*). She opined he would miss work more than four days each month. (Tr. 1705). She concluded by stating that Mr. Wheeler "does well when he is stable but does not stay stable for long periods of time." (Tr. 1705).

## IV.   ADMINISTRATIVE HEARING

At the hearing before the ALJ, Mr. Wheeler testified he lived in an apartment with his partner, had a valid driver's license, and had completed high school. (Tr. 40). He sometimes washed dishes, cooked meals, shopped, or did laundry. (Tr. 41). He had trouble at times with his personal hygiene; depending on his mood he might not brush his teeth, shave, or bathe. (*Id.*). He usually sleeps ten to twelve hours each night and wakes up fatigued; he will often take naps during the day to get rid of the fatigue. (Tr. 42). Even if he is in bed for a long period of time, he experiences irregular and broken sleep. (Tr. 48-49). He tries to read but loses focus. (*Id.*). He watches television; he will message his mom or one friend. (*Id.*). If he needs to run errands, he will have his partner drive because he is too anxious to drive himself. (Tr. 43).

He last worked in a part-time job in May or June 2020. (*Id.*). He left this position voluntarily because he experienced a manic episode. (*Id.*). He described this episode as "the worst mania [he'd] ever had" and that he was "concerned for other people's safety" because of his

irritability. (*Id.*). He did not request medical leave. (*Id.*). He had a full-time job as a service desk analyst for a period of four months. (Tr. 44). He left this job because of his first hospitalized suicide attempt. (*Id.*). Mr. Wheeler described his mental health as the reason he cannot work: "when I'm in a depressive episode, I tend to attempt suicide. And when I'm manic, like I said, I feel unsafe for other people." (*Id.*). His last manic episode was in 2020 and lasted for months before he found medicine to relieve it. (Tr. 45). His last suicide attempt was in 2018. (*Id.*).

He was in counseling and met with a therapist once every two weeks. (*Id.*). He did not feel he was benefiting from this relationship and so was looking for a new therapist. (*Id.*). He received intensive outpatient group therapy from Mercy Hospital and felt it very helpful. (*Id.*). He was also receiving medication management from NP Dunaway. (Tr. 45-46). He took Rexulti, trazodone, and prazosin. (Tr. 46). He experienced fatigue as a side effect. (*Id.*).

He is very anxious around people; if he is in a crowd, he gets shaky, trembles, becomes irritable, and sweats profusely. (*Id.*). He has the same reaction in smaller groups of five or six people, including family. (*Id.*). He was withdrawn and anxious during group therapy as well, until he was on a new medication. (Tr. 46-47). However, he needed to discontinue this medication due to side effects. (Tr. 47). Although he went on a trip to Georgia to visit family, he managed by having his partner drive, he would only get out of the car to use the bathroom, and he only visited family one-on-one. (*Id.*). His doctors told him his manic episodes manifest as anger or irritability rather than high energy like others experience. (Tr. 50-51). If he is angry, he will seclude himself so he does not lose control. (*Id.*).

Mr. Wheeler endorsed memory issues; he uses reminder notes and things to help him remember. (Tr. 47-48). If he is watching a movie, he will pause it throughout and take a break

because he cannot focus. (Tr. 48). He used to draw, paint, write books, and play board games but can no longer do so because of his medical problems. (Tr. 51). On a bad day, he stays in bed and browses on his phone; he does not cook, bathe, shave, brush his teeth, or eat much. (Tr. 51-52). Bad days occur three or four times a week, even while on medication. (Tr. 52).

The VE testified a hypothetical individual of the same age and education as Mr. Wheeler and with the limitations described in the RFC could perform representative jobs of industrial cleaner, kitchen helper, and hand packager. (Tr. 53-55). But the hypothetical individual could not maintain employment if the person missed work three times per month. (Tr. 55). An individual off task consistently for 15 to 20% of the workday is not employable. (Tr. 56).

## STANDARD FOR DISABILITY

A claimant is not eligible for benefits absent a disability. *See* 42 U.S.C. §§ 423(a), 1382(a). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

12

> 5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. At Step Five, the burden shifts to the Commissioner to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

On February 9, 2022, the ALJ issued an unfavorable decision. (Tr. 43). At Step One, the ALJ determined Mr. Wheeler met the insured status requirements of the Social Security Act through September 30, 2024 and had not engaged in substantial gainful activity since the alleged onset date. (Tr. 21). At Step Two, the ALJ identified the following severe impairments: bipolar disorder and generalized anxiety disorder. (*Id.*). The ALJ also determined Mr. Wheeler was initially obese but had lost weight and was no longer obese at the time of the decision. (Tr. 22).

At Step Three, the ALJ determined Mr. Wheeler did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ specifically addressed Listings 12.04 and 12.06. (Tr. 22-24). The ALJ concluded Mr. Wheeler had moderate limitations

in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (*Id.*).

Before proceeding to Step Four, the ALJ reviewed the medical records, function reports, administrative hearing testimony, and medical opinions and determined Mr. Wheeler has the residual functional capacity to perform work at all exertional levels except he can perform simple routine asks with simple short instructions, can make simple decisions, can have occasional workplace changes with no fast-paced production quotas, can have occasional interaction with coworkers and supervisors, can have no interaction with the public and cannot perform tandem work. (Tr. 24).

The ALJ determined Mr. Wheeler does not have any past relevant work. (Tr. 30). At Step Five, the ALJ concluded there are jobs that exist in significant numbers in the national economy that Mr. Wheeler can perform, including industrial cleaner, kitchen helper, and hand packager. (Tr. 30-31).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of*

14

*Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

15

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Mr. Wheeler brings one issue for review: whether substantial evidence supports the ALJ's decision where the ALJ did not find his treating source's opinion persuasive. (ECF #9, PageID 1737, 1739). He argues the ALJ's finding that NP Dunaway's opinion was not supported or fully consistent with the record was flawed and his reasoning insufficiently particular for the reviewing court to determine whether substantial evidence supports the decision. (*Id.* at PageID 1742).

The Commissioner counters that the ALJ's decision was reasonable and supported by substantial evidence. (ECF Doc. 12, PageID 1759-61). The Commissioner argues the ALJ supported his decision consistent with the requirement to describe the "supportability" and "consistency" of the opinion, and the ALJ was not required to further opine on the length of treating relationship or other factors. (*Id.* at 1760-61).

I agree with the Commissioner: substantial evidence supported the ALJ's decision. Remand is thus not warranted.

Because Mr. Wheeler filed his application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. §§ 404.1520c, 416.920c. Under these revised

regulations, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at §§ 404.1520c(b), 416.920c(b). The ALJ need not defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).

In determining medical opinion's persuasiveness, the ALJ considers five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors tending to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(b)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2) & 416.920c(a).

With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1) & 416.920c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . ." 20 C.F.R. §§ 404.1520c(c)(2) & 416.920c(c)(2). The ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. §§ 404.1520c(b)(2) & 416.920c(b)(2). Conversely, the ALJ "may, but [is] not required to, explain" how he considered the relationship, specialization, and other factors set forth in subparagraphs (c)(3) through (c)(5) of the regulation. *Id.* If two or more medical

opinions about the same issue are equally well-supported and consistent with the record, but are not exactly the same, the ALJ must "articulate how [he] considered the other most persuasive factors" of relationship, specialization, and other factors set forth in subparagraphs (c)(3) through (c)(5). 20 C.F.R. §§ 404.1520c(b)(3) & 416.920c(b)(3).

Here, the ALJ provided the following analysis of NP Dunaway's opinion:

> The claimant's provider, Ms. Dunaway, submitted mental residual functional capacity questionnaire on January 24, 2022. Ms. Dunaway stated that the claimant was diagnosed with bipolar disorder (most recent episode depression mild to moderate, improved and stable at present) and generalized anxiety disorder with panic attack. She noted that the claimant did not have long periods of stability or remission in between hospital inpatient admissions. Ms. Dunaway felt that the claimant was unable to meet competitive standards for maintaining attention for a two-hour segment, maintaining regular attendance and being punctual within customary, usually strict tolerances, and completing a normal workday and workweek without interruptions from psychologically based symptoms. She explained that the claimant was seriously limited, but not precluded from accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, and dealing with normal work stress. Ms. Dunaway believed that the claimant was limited, but satisfactory, for remembering work-like procedures, understanding, remembering, and carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, performing at a consistent pace without an unreasonable number and length of rest periods, asking simple questions or requesting assistance, responding appropriately to changes in a routine work setting, and being aware of normal hazards and taking appropriate precautions. Ms. Dunaway opined that the claimant was seriously limited, but not precluded from dealing with stress of semi-skilled or skilled work and limited, but satisfactory, at understanding, remembering, and carrying detailed instructions and setting realistic goals or making plans independently of others. She stated that the claimant was seriously limited, but not precluded, from adhering to basic standards of neatness and cleanliness, traveling in an unfamiliar place, and using public transportation. She felt that the claimant was limited, but satisfactory, for interacting appropriately with the general public and maintaining socially appropriate behavior. Ms. Dunaway explained that the claimant did well when he was stable but did not stay stable for long periods of time. She opined that the claimant would be absent from work more than four days per month.

18

> The undersigned finds the opinion of Ms. Dunaway not persuasive as treatment records do not reflect the complete inability to attend to tasks or deal with stress. **The opinion was not supported by other mental status findings discussed in detail above or with Ms. Dunaway's own notations at times that the claimant's bipolar disorder was stable and/or in remission.** Further, the claimant testified that he was able to watch Netflix, play video games, and live with his partner. **The opinion was not consistent with the opinions of the State Agency psychologists but was mostly consistent with the testimony of the claimant.**

(Tr. 29-30) (internal citations omitted) (emphasis added). The ALJ's discussion of NP Dunaway's opinion clearly states his findings regarding the supportability and consistency of NP Dunaway's opinion against her own treatment records and of the record as a whole. Despite Mr. Wheeler's contentions to the contrary, there is sufficient explanation in the decision for subsequent reviewers to follow the ALJ's reasoning. I see no reversible error as to the ALJ's articulation of the "supportability" and "consistency" factors.

I likewise find no reversible error in Mr. Wheeler's contention that the ALJ's reasoning on this issue was flawed. In essence, he argues that because his treating provider's opinion was consistent with his own subjective complaints, because no consultative examiner provided an opinion, and that because he will have periods of good days and bad days, NP Dunaway's opinion should have been found persuasive. (*See* ECF #9, PageID 1742-44). But this is not the standard for my review. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen*, 800 F.2d at 545. Therefore, when substantial evidence supports the ALJ's decision, I must defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Here, the ALJ indicated he found NP Dunaway's opinion not persuasive because it was inconsistent with her mental status findings and treatment notes indicating Mr. Wheeler's bipolar disorder was stable and/or in remission. (Tr.

19

30). My review of the record reveals the same. For example, NP Dunaway's treatment records disclose the following:

- Diagnostic impressions indicating bipolar disorder stable in remission. (*E.g.*, Tr. 1608, 1688).

- Mental status examinations within normal limits with euthymic mood and appropriate affect. (*E.g.*, Tr. 1687, 1693).

The ALJ also stated NP Dunaway's opinion was not consistent with the state agency opinions. Yet, as the ALJ implied in determining NP Dunaway's opinion not consistent with her own treatment records and not supported by the state agency opinions, NP Dunaway's *treatment records* are indeed consistent with and support the state agency reviewer's comment that Mr. Wheeler "had a period of time where is symptoms were not well managed, but his new medication regimen appears to be working better. He is more stable at psych visits . . . ."[1] (Tr. 95, 104).

Substantial evidence supports the ALJ's determination that NP Dunaway's opinion was unpersuasive. I find no reversible error.

## Conclusion

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: January 25, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

---

[1] I also note that Mr. Wheeler has had periods of decompensation and was previously hospitalized for suicide attempts. (*See, e.g.*, Tr. 349-53). Those incidents are before the alleged onset date and thus are not within the adjudicated period for this case. (*See* Tr. 322-82).

20